UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------

| | | |
|---|---|---|
| LUZAR TRADING, S.A., | : | Index No. 20-cv-00623 |
|     Petitioner, | : | |
| | : | **ANSWER TO PETITION TO** |
|     v. | : | **CONFIRM ARBITRATION** |
| | : | **AWARD AND CROSS-** |
| TRADIVERSE CORPORATION, | : | **PETITION TO VACATE OR** |
|     Respondent. | : | **MODIFY AWARD** |
| | : | |

-------------------------------------------------------

Respondent/Cross-Petitioner Tradiverse Corporation ("Tradiverse"), by and through its undersigned counsel, as and for its Answer to Petitioner Luzar Trading S.A.'s ("Luzar") Petition (the "Petition") to Confirm Arbitration Award issued on December 20, 2019 (the "Award") and their Cross-Petition to Vacate the Award, or in the alternative, Modify the Award, respectfully allege and state as follows:

## ANSWER TO PETITION

### General Denial

Except as expressly admitted herein, Tradiverse generally denies each and every allegation of the Petition.

### Nature of Proceedings

1.  This introductory paragraph sets forth legal conclusions and questions of law to which no response is required.

### The Parties

2.  Tradiverse admits the allegations in Paragraph 2 of the Petition.

3.  Tradiverse admits the allegations in Paragraph 3 of the Petition.

### Jurisdiction and Venue

4.      This paragraph sets forth Petitioner's jurisdictional allegations that present legal conclusions and questions of law to be determined solely by the Court, to which no answer is required.  To the extent that a response is required, Respondent avers that the Court has jurisdiction under 28 U.S.C. § 1332.

5.      This paragraph sets forth Petitioner's venue allegations that present legal conclusions and questions of law to be determined solely by the Court, to which no answer is required.  To the extent that a response is required, Respondent admits that the proper venue for Plaintiff's claim is determined under 28 U.S.C. § 1391.

6.      This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, Tradiverse admits the allegations in Paragraph 6 of the Petition.

### Background Facts

7.      Tradiverse admits the allegations in Paragraph 7 of the Petition.

8.      Tradiverse admits the allegations in Paragraph 8 of the Petition.

9.      This paragraph contains legal conclusions to which no response is required. To the extent that a response is required Tradiverse admits that Luzar paid a 10% deposit for the soybean meal as defined within the Contract, however, Tradiverse denies that there was any repudiation of the Contract and refers all questions of law to this Honorable Court.

10.      Tradiverse denies the allegations in Paragraph 10 of the Petition in the form alleged.

11.      This paragraph contains legal conclusions to which no response is required. To the extent that a response is required Tradiverse denies the allegations as alleged in Paragraph 11 of the Petition and refers all questions of law to this Honorable Court.

12.     Tradiverse lacks sufficient knowledge and information to form a belief as to the truth of the allegations in Paragraph 12 of the Petition, and thus denies.

13.     Tradiverse admits the allegations in Paragraph 13 of the Petition.

14.     Tradiverse admits the allegations in Paragraph 14 of the Petition.

15.     Tradiverse admits the allegations in Paragraph 15 of the Petition.

16.     Tradiverse admits the allegations in Paragraph 16 of the Petition.

17.     Tradiverse denies the allegations in Paragraph 17 of the Petition as that Paragraph incorrectly alleges that the Panel issued a Final Award in December 20, 2020—a date which not yet occurred, however, Tradiverse admits that the Panel did issue an Award on December 20, 2019, and that a true and accurate copy of that Award is annexed to Luzar's Petition as Exhibit 2.

18.     Tradiverse admits the allegations in Paragraph 18 of the Petition that the Panel awarded Luzar interest at a rate of "2.5% per annum over the New York Prime Rate simple interest," however Tradiverse denies the accuracy of the calculation of interest and further denies that the calculated amount of interest is owed to Luzar.

19.     This paragraph contains legal conclusions to which no response is required. To the extent that a response is required Tradiverse denies the allegations as alleged in Paragraph 19 as to any amount due and owing to Luzar and refers all questions of law to this Honorable Court.

20.     Tradiverse admits the allegations within Paragraph 20 as to the facts that the Panel directed that full payment under the Award must be made within 30 days after the issuance of the Award and that the Tradiverse has not paid the award, however, Tradiverse denies the allegation that it is in default and that it has given no reason for its purported default, as Tradiverse objects to and contests the Award, had previously filed a Petition challenging the Interim Award within the same Arbitration Proceeding and now further challenges the Final Award on the grounds that

3

is invalid, unenforceable and subject to vacatur, a position that Luzar has previously and continuously been availed to.

21.     Tradiverse denies the allegations within Paragraph 21 in the form alleged.

22.     Tradiverse admits the allegations within Paragraph 22.

### The Award is Entitled to Confirmation

23.     This paragraph contains legal conclusions to which no response is required. To the extent that a response is required Tradiverse admits the allegations as alleged in Paragraph 23.

24.     Tradiverse denies the allegations within Paragraph 24 and refers all questions of law to this Honorable Court.

25.     Tradiverse denies the allegations within Paragraph 25 and refers the Court to the Cross-Petition contained herein along with the accompanying Notice of Cross-Petition to Vacate or Modify Arbitration Award and Tradiverse's Memorandum of Law in Support of Cross-Petition to Vacate or Modify Arbitration Award.

26.     This paragraph contains legal conclusions to which no response is required. To the extent that a response is required Tradiverse denies the allegations as alleged in Paragraph 26 and refers all questions of law to this Honorable Court.

### CROSS-PETITION TO VACATE, OR IN THE ALTERNATIVE, MODIFY ARBITRATION AWARD

### Nature of Objection and Cross-Petition

27.     Respondent Tradiverse, hereby respectfully cross-petitions this Court, pursuant to 9 U.S.C. § 10 to vacate or modify the Award or parts of the Award issued on December 20, 2019 ordering that Tradiverse's claims for damages and lost profits are denied in their entirety and that Tradiverse is to pay to Luzar the amounts stated therein totaling to $900,492.12 plus interest.

28.     This Cross-Petition is brought upon the grounds that the members of the Arbitral panel exceeded their powers in rendering the Award, that the Award was procured by corruption, fraud or undue means; and that the arbitrators were guilty of misconduct in admitting and considering as evidence to the proceeding, a certain number of inadmissible correspondences which had clearly been marked "FOR SETTLEMENT PURPOSES ONLY."

29.     At a minimum, parts of the Award should be vacated, and this Court should allow for the necessary discovery which demonstrates the fraudulent nature of the arbitral findings and thereby Petitioner's procurement of the Award, before modifying the Award in accordance with what is fair and just, or before otherwise remanding the matter to Arbitration for a new hearing before newly empaneled arbitrators free of the fraudulently procured bias and who have not been tainted by improper and inadmissible documentary evidence.

30.     It is requested that the Court take note that on or about September 17, 2019, Respondent herein, Tradiverse, filed a Petition under Case No. 19-cv-08652 seeking to Stay and Vacate the Emergency Interim Arbitration Award dated June 17, 2019, which was an interim award that preceded the December 20, 2019 Award, the Award now at the heart of this proceeding, and which Petitioner's seek to enforce and Respondents now seek to vacate, or otherwise, modify[1].

31.     Tradiverse's prior petition alleged and this cross-petition maintains the allegation that the Panel in issuing both its earlier interim Award and the final Award, erred by allowing for the admission of privileged settlement communications that were presented to the arbitral panel without notice to Tradiverse and without allowing for an opportunity for Tradiverse to object and

---

[1] During the pendency of the previously filed and now withdrawn Petition under Case No.: 19-cv-08652, the arbitral panel held that the interim award should be disregarded and that the parties should await the final award.

then further proceeded to issue a decision which relied, in part, upon those privileged settlement communications.

## Factual Background

32.     Throughout the first half of 2018, Tradiverse and Luzar entered into Broker's Contracts Nos. 121384, dated April 17, 2018, Broker's Contract no. 121633, dated June 5, 2018, and Broker's Contract No. 120993, dated May 9, 2018 with Luzar (collectively, the "Contracts"), for the sale of soybean meal and yellow soybeans (the "Commodities").  All of the Contracts incorporate NAEGA Clause 20.

33.     Under the Contracts, shipment was scheduled for June 16-30—both dates included—and the IFG Export Grain Terminal in Lake Charles, Louisiana (the "Terminal") was designated by the parties as the port where loading of the Commodities onto Luzar's vessel would occur.

34.     On June 28, 2018, a fire and explosion in a grain silo at the Terminal occurred. Although there were no injuries and no deaths, the incident damaged the silo where it occurred and required the City of Lake Charles Fire Department ("Governmental Authorities") to respond. As part of its response, the Governmental Authorities ordered that the electrical power to the entire Terminal be shut down, thereby preventing all further loading of any vessels.

35.     Loading of the Commodities onto Luzar's vessel had already commenced when the fire occurred and the decision to shut down power to the Terminal was made by the Governmental Authorities.  As a result, the Terminal was forced to discontinue loading the vessel.  The very same day the fire occurred, and power to the Terminal was shut down by the government, in accordance with the notice requirements contained in NAEGA Clause 20, Tradiverse provided Luzar with

notice of the incident and that all of its obligations under the Contracts had been suspended pursuant to NAEGA Clause 20.

36.     NAEGA's Clause 20—contained in NAEGA Contract No. 2—provides that "obligation of seller to make delivery shall be suspended" if "delivery by seller of the commodity, or any part thereof, is prevented or delayed at the port(s) of delivery and/or elevator(s) of delivery," by:

>  (1) Riots, strikes, lockouts, interruptions in or stoppages of the normal course of labor,
>
>  (2) Embargoes or exceptional impediments to transportation, or;
>
>  (3) Action by Federal, State or local government or authority.

37.     In each case, "the delivery period shall be deemed to be extended by a number of days equivalent to the period starting with the commencement of the causes or the commencement of the delivery period, whichever is later, and ending with the termination of the causes, and/or the resumption of work after the termination of the causes, whichever is later."

38.     When a Clause 20 event occurs, the seller is required to submit an Application to NAEGA for a "Clause 20 Certificate."

39.     Once the NAEGA Application is submitted by the seller, the President of NAEGA forms a subcommittee or a panel to determine whether a Clause 20 condition existed, and how long it lasted.

40.     If NAEGA determines that a cause for a delay in loading a shipment fits within certain "causes" set forth in Clause 20, then NAEGA issues a "Clause 20 Certificate," which relieves the seller from any obligation to pay demurrage or other damages during the period of the delay.

41.     As NAEGA itself explains:

NAEGA committee investigates the merits of any application made to the Association by a shipper for the issuance of any certificate or for the furnishing of any information relating to strikes, riots, lockouts, and embargoes, or other conditions affecting his contract and to approve the issuance of certificates or cables **pursuant to, and in accordance with, the rules adopted by the Association and the committee's own rules of procedure.**[2] (emphasis added).

42.     NAEGA's Clause 20 procedure is very limited in scope.

43.     NAEGA itself states that its "determination shall be limited to: 1.- The validity of the cause by verifying or denying that a Clause 20 condition exists" and "2. - The beginning and end of the Cause that has been determined to be valid."[3]

44.     NAEGA's Clause 20 procedure provides that the Panel, in making this determination, is to consider only submissions by the seller.  For example, NAEGA's rules state that the "applicant for a NAEGA certificate is solely responsible for furnishing the appropriate documentation and an explanation to support their claim."[4]  There is no provision allowing the buyer of a commodity or any other person to submit any information, documentation or argument to NAEGA, and it is NAEGA's procedure and practice that the buyer does not submit, and NAEGA does not consider, documents or evidence submitted by the buyer or any other person.

45.     NAEGA's Clause 20 procedures also state that the Panel's determination should consider:
     1. The evidence provided in the Application to the NAEGA for a Clause 20 Certificate;
     2. Consistency with the NAEGA 2 and applicable contracts;
     3. Relevant customs of trade; and
     4. Prevention or reversal of the resulting NAEGA certification by arbitration or courts;

---

[2] See http://naega.org/?page_id=1223.  See also, e.g., http://naega.org/images/mission.pdf.

[3] http://naega.org/wp-content/uploads/2012/05/NAEGA-Clause-20-Policies-andGuidance-FINAL-Approved-by-BOD-5-26-2017-.pdf.

[4] http://naega.org/wp-content/uploads/2012/05/Strikes_Committee_Guidence_04-1409.pdf.

46.     These are written, well-defined, and established rules or standards of a NAEGA Clause 20 application. Once again, there is no provision that allows a buyer or any other person to contest a Member's Clause 20 application or submit information to NAEGA.

47.     In NAEGA's history it has been its custom and practice to consider only submissions from the seller, and not the buyer or any other person.

48.     Indeed, industry experts are unaware of any previous time that a buyer has contested a seller's Clause 20 application or convinced NAEGA to consider facts and issues outside of what is stated in NAEGA's rules, policies and procedures.

### Luzar's Interference With Tradiverse's Clause 20 Application

49.     Long before Tradiverse was able to gather the information that was required to submit its Clause 20 Application, the buyer and Defendant herein, Luzar, wrote a letter to NAEGA contesting Tradiverse's right to a Clause 20 certification.

50.     Despite its premature nature, Luzar took a very aggressive stance in its arguments. Among other things, Luzar argued that Tradiverse should not be entitled to a Clause 20 Certificate simply because Tradiverse's CEO also served as an executive at the Terminal where the fire occurred.  Luzar further alleged without any basis that the fire was the fault of the Terminal.   Upon information and belief, in addition to filing these arguments with the ICDR, Luzar also provided copies of, or made similar arguments to, NAEGA.

51.     Specifically, Luzar's Execution Manager Mr. Ricardo Azpurua told Tradiverse that it was taking the position that "the terminal explosion was not a valid Clause 20 'cause.' We have noted this position in a letter to the NAGEA [sic] President for forwarding to the Clause 20 certification committee."

52.     That was highly improper, a breach of industry custom and practice.

53.     Moreover, despite the fact that no confidentiality provision governs Luzar's submission to NAEGA, both Luzar and NAEGA have refused to provide Tradiverse with a copy of their communications.

54.     Shortly after writing to NAEGA, Luzar prematurely filed an arbitration against Tradiverse before the International Center for Dispute Resolution ("ICDR"). The arbitration filing was premature because, without NAEGA conducting an appropriate review and consideration of a Clause 20 Application, the arbitration panel would be unable to determine what damages, if any, Luzar had suffered as a result of the delay in loading.

55.     Despite its premature nature, Luzar took a very aggressive stance in its arguments. Among other things, Luzar argued that Tradiverse should not be entitled to a Clause 20 Certificate simply because Tradiverse's CEO also served as the president of the Terminal where the fire occurred. Luzar further alleged that the fire was the fault of the Terminal.

56.     Upon information and belief, in addition to filing these arguments with the ICDR, Luzar also provided copies of, or made similar arguments to, NAEGA.

57.     In fact, shortly after Luzar's arbitration filing, NAEGA's representatives reached out to Tradiverse to advise that NAEGA "received word that there is an ongoing arbitration regarding this event, and we would like to understand the circumstances around this arbitration." NAEGA did not explain where it had "received word" or obtained this information, however it did not obtain this information from Tradiverse.

58.     More alarming, NAEGA began asking questions to Tradiverse that indicated NAEGA wanted to know if the owner of the Terminal might have been at fault for the fire, exactly as Luzar had argued before the ICDR. Specifically, NAEGA's President wrote to Tradiverse and asked: "Can you provide records of inspection, explosion / fire safety assessments, conditions in

the area near the explosion or reports of elevator conditions including exterior visual assessment that prior to the underlying explosion?"

59.     NAEGA's questions clearly came straight from Luzar's inappropriate submissions and arguments before NAEGA or other inappropriate sources.5

60.     Of course, NAEGA's own rules and policies for Clause 20 applications do not provide for NAEGA to review an arbitration as part of the Clause 20 process or gather and consider information from any other sources besides the applicant, which in this case is Tradiverse.

61.     On February 1, 2019, NAEGA issued its final recommendation on Tradiverse's Clause 20 Application.

62.     Remarkably, in NAEGA's own explanation for the denial, it stated that the reason was not a proper reason, but rather because it believed that the issue of a fire was "a cause within the control of the facility operator," (which notably is not Tradiverse), and which is precisely the argument that Luzar was peddling to the ICDR and, upon information and belief, to NAEGA as well:

> While it is obvious that Tradiverse was delayed in fulfilling its obligations under the contract because of the fire and damage at the facility, it was the fire and damage that precipitated the delay (a cause within the control of the facility operator), and not the order to cut the power by the Lake Charles Fire Chief. The panel is of the opinion that a fire, and the damage done to the facility, were the reason that the party Tradiverse had contracted to load the vessel failed to perform, not action by a governmental authority. (emphasis added).

63.     Tradiverse was the party who suffered the delay based upon the fire at the Terminal, and Tradiverse was not at fault at all with respect to the fire.

---

5 Upon information and belief, Luzar had many more interactions with NAEGA that have not yet been disclosed to Tradiverse.

64.     Moreover, Clause 20 itself provides for relief from circumstances that are within the control of the loading port.  For example, a Clause 20 Certificate is appropriate where there has been a "strike" or a "lockout."  A "lockout" by its very nature is within the control of the loading port, and many strikes are as well.

65.     In addition to wrongfully considering the alleged fault of the Terminal owner in allegedly not preventing the fire, NAEGA also delved into many other extraneous items.  For example, NAEGA's President asked: "Did Tradiverse attempt to source or make available capacity and appropriate quality SBM in order to load the vessel elsewhere?"  Similarly, he also asked "[h]ow did Tradiverse respond the requests from the buyer" regarding certain other items.

66.     Once again, neither of these inquiries relate to the validity of the Clause 20 cause or the beginning and end of the cause.

67.     Finally, and equally egregious, NAEGA's procedures state that NAEGA "staff will inform the Panel of relevant past determinations and provide the Panel with assistance to arrive at its determination."  However, in this instance, NAEGA advised Tradiverse that relevant past determinations were not provided to the Panel as part of its review of Tradiverse's Clause 20 Application. In fact, the President of NAEGA, Mr. Gary Martin, informed Tradiverse that no precedent would be supplied or considered by the Panel.

### *The NAEGA Conflict of Interest*

68.     It is undisputed that the panel which denied Tradiverse's Clause 20 Application was a panel convened by a NAEGA consisting of including Heidi Hains, Jessica Stephan and Michael Kaye.

69.     Mr. Kaye was at the time employed by a large corporation in the agrobusiness sector, ADM. During the course of the First Arbitration, Tradiverse raised issue with Mr. Kaye

serving as a panelist on the NAEGA Clause 20, because Mr. Kaye's employer, ADM, sought to purchase the facility where the claimed Clause 20 event occurred.

70.     In the course of the First Arbitration, Tradiverse's counsel argued that senior members of ADM harbored animus and resentment against Tradiverse, the Terminal and Mr. Kabir Ahmad, who holds a senior role at both the facility and Tradiverse and that ADM vowed to punish both Tradiverse and the Terminal, which is the facility where the claimed Clause 20 event had occurred.

71.     It was further argued that Mr. Kaye was overly active in the arbitration proceeding and that is was by his persuasion that the Clause 20 Certificate was denied.  Further feeding to the optics of this apparent and manifest bias against Tradiverse is demonstrated in both the NAEGA Clause 20 proceeding and the First Arbitration, where Gary Martin, the CEO of NAEGA, appeared as a witness on behalf of Luzar.

72.     Mr. Martin not only offered testimony in defense of Mr. Kaye's impartiality to serve as a panel member on the Clause 20 application, but he further testified that Mr. Kaye referred Mr. Martin to the attorneys who then represented Mr. Martin during the course of his appearance in the First Arbitration.

73.     Mr. Martin was unequivocal of his defense of Mr. Kaye and the panel's decision on the Clause 20 Application. His testimony was an abject defense of NAEGA and its panelists, in the process admitting that Tradiverse's efforts to litigate the unjust Clause 20 denial was placing NAEGA in financial hardship.

74.     Through the course of his conduct and testimony, Mr. Martin abdicated any specter of impartiality on the part of NAEGA and in so doing, called into question not only the entirety of the Clause 20 Proceeding, but also the susceptibility to bias for any arbitrator empaneled from

NAEGA's approved lists in both the First Arbitration and the arbitration that resulted in the Award presently before this Court.

75.     Furthermore, as detailed above, NAEGA not only allowed for interference with the Clause 20 application, they further went on to refuse to disclose certain correspondence by and between Luzar and NAEGA, quite curiously hiding behind a purported Joint Defense Agreement.

76.     Other correspondence sought by and between NAEGA and ADM employee Michael Kaye was claimed to be Work Product Privileged. These blatant attempts to hide relevant evidence and obscure the dealings between the parties bear all of the hallmarks of bias, corruption, and procurement by undue means.

77.     Perhaps even more glaring as to NAEGA's continuing campaign to undermine the fairness of the First and Second Arbitration was NAEGA's unexplained commissioning of one panel member from of each of the First and Second arbitration panels on a lavish trip to Tokyo Japan during the course of the First and Second Arbitrations,

78.     Specifically, on November 22, 2019, during the course of both the First and Second Arbitrations, NAEGA through its President, Gary Martin, commissioned a panel member from each of the respective First and Second Arbitration panels to travel to Japan for an lavish trip.

79.     Coincidentally, the individuals chosen to go on this trip were the arbitrators chosen by Tradiverse to serve on the Arbitration Panels, Sam Bonilla and Andrew Marting, along with Mr. Martin, Luzar's star witness in one of the arbitrations.

80.     No conflict of interest was disclosed by Mr. Martin, Mr. Marting or Mr. Bonilla with respect to this travel benefit and its timing.

### *Petitioner's Breach of Contract # 121385*

81.     It is among this highly litigious backdrop which the parties continued to conduct business under the terms of the balance of the 2018 Contracts. Contract #121385 dated April 2018 required Tradiverse to sell, and for Luzar to purchase, soymeal. The contract required Luzar to provide a timely deposit of $700,530.00.

82.     According to the timeline established by the contract that is the subject of the parties' dispute, Luzar was required to make a deposit by September 1, 2018, in advance of the soymeal shipment that was scheduled to occur between September 15-30, 2018. Furthermore, according to the "Statement of Facts" set forth in the Award, it is undisputed that the deposit was not made until September 4, causing Tradiverse to declare Luzar in default. (See Exhibit 2 to the Petition, ¶ 38). On these facts alone, the only relevant facts that exist, the Arbitral Panel could render only one decision, an Award in favor of the Respondents.

83.     However, beginning on September 3, Luzar engaged in extensive communications with its own counsel—exchanging at least 13 emails with its lawyers—before it finally initiated contact with Tradiverse for the first time on September 6. (See Exhibit 2 to the Petition, ¶¶ 39, 40, 41).

84.     Luzar's first communication with Tradiverse was an email that it labeled "FOR SETTLEMENT PURPOSES ONLY."  (Id). Tradiverse responded in kind an hour later, and likewise labeled its email "FOR SETTLEMENT PURPOSES ONLY."  (Id). The next day, September 7, Luzar wrote another email and again labeled the email "FOR SETTLEMENT PURPOSES ONLY." (Id).

### *Arbitral Panel's Improper Consideration of Privileged Settlement Communications*

85.   A reading of the Arbitral Panel's Interim and Final Awards collectively, demonstrate that the Award was expressly based on the parties' exchange of emails between September 6-7, despite the bold, underlined, and all-caps text announcing the parties' intention that the communications were "FOR SETTLEMENT PURPOSES ONLY," and not to be disclosed outside the context of the parties' settlement negotiations. (Id.) Tradiverse initiated the arbitration, alleging that Luzar breached the contract and committed fraud, resulting in the forfeiture of the deposit in addition to other damages. Luzar filed a counterclaim, alleging that Tradiverse repudiated the contract and sought the return of its deposit in addition to other damages.

86.   In this instance, the Court must look to the Interim Award to have a complete understanding of the rationale and improper analysis carried out by the arbitral panel in its issuance of the Final Award. A true and accurate copy of the panel's Interim Award issued on June 17, 2019 is exhibited hereto as Exhibit 1. Though it may be true, as the arbitral panel observed in its interim award, that the Federal Rules of Evidence are not strictly applicable in the context of arbitration, it is simply not true that "the disclosure of settlement negotiations" is "rarely, if ever, . . . prejudicial." (See Exhibit 1 p. 5 n.1.)

87.   Tradiverse was not provided any notice that the settlement communications would be disclosed and lodged an objection as soon as the disclosure was made; and the arbitral panel not only accepted the evidence, but expressly cited it as the basis for its interim award, and during the final hearing, confirming that the settlement communications were heavily relied on by the arbitral panel, and rendering the error inherently prejudicial to Tradiverse.[6] Tradiverse was

---

[6] Though the arbitral panel suggested, in passing, that the settlement communications may have been "irrelevant to this motion," Interim Award at 5 n.1, that statement is impossible to square with the fact that the content of the settlement communications comprise almost the entirety of the "Statement of Undisputed Material Facts" resulting in the interim award.

deprived of a fundamentally fair hearing by absorbing the one-two punch of (a) Luzar's failure to provide any notice or an opportunity to object to its introduction of confidential settlement communications; and (b) the arbitral panel's refusal to consider or address the merits of Tradiverse's request for sanctions to ameliorate the due-process violation by excluding the settlement communications from its consideration.

## THE COURT SHOULD VACATE THE FINAL AWARD

### *A. The Award*

88.     This cross-petition stems from a dispute over an April 2018 contract for Tradiverse to sell, and for Luzar to purchase, soymeal. The contract required Luzar to provide a timely deposit of $700,530.00.

89.     Tradiverse initiated the arbitration, alleging that Luzar breached the contract and committed fraud, resulting in the forfeiture of the deposit in addition to other damages. Luzar filed a counterclaim, alleging that Tradiverse repudiated the contract and sought the return of its deposit in addition to other damages.

90.     On December 20, 2019, the arbitral panel issued an Award ordering that Tradiverse's claims for damages and lost profits are denied in their entirety and that Tradiverse is to pay to Luzar the amounts stated therein totaling to $900,492.12 plus interest. Exhibit 2 to the Petition.

91.     The arbitral panel entered its award based, in part, on "emails that were marked 'for settlement purposes,'" because, in its view, the Federal Rules of Civil Procedure do "not apply to arbitration proceedings, and the disclosure of settlement negotiations in arbitration has rarely, if ever, been found to be prejudicial."

## *B. The Privileged Settlement Communications*

92.     According to the timeline established by the contract that is the subject of the parties' dispute, Luzar was required to make a deposit by September 1, 2018, in advance of the soymeal shipment that was scheduled to occur between September 15-30, 2018.

93.     According to the "Statement of Facts" set forth in the Award, however, it is undisputed that the deposit did not reach Tradiverse's bank account until September 4, causing Tradiverse to declare Luzar in default. (See Exhibit 2 to the Petition, ¶ 38).

94.     Beginning on September 3, Luzar engaged in extensive communications with its own counsel—exchanging at least 13 emails with its lawyers—before it finally initiated contact with Tradiverse for the first time on September 6.  (See Exhibit 2 to the Petition, ¶¶ 39, 40, 41).

95.     Luzar's first communication with Tradiverse was an email that it labeled "FOR SETTLEMENT PURPOSES ONLY."  (Id).

96.     Tradiverse responded in kind an hour later, and likewise labeled its email "FOR SETTLEMENT PURPOSES ONLY."  (Id).

97.     The next day, September 7, Luzar wrote another email and again labeled the email "FOR SETTLEMENT PURPOSES ONLY." (Id).

98.     The Award was expressly based on the parties' exchange of emails between September 6-7, despite the bold, underlined, and all-caps text announcing the parties' intention that the communications were "FOR SETTLEMENT PURPOSES ONLY," and not to be disclosed outside the context of the parties' settlement negotiations. (Id).

*C. The Final Award, as Demonstrated by the Interim Award, Relied upon the Settlement Communications*

99.     As arbitration continues to grow in popularity as the preferred means for resolving commercial disputes, the Award entered by the arbitral panel in this case sets a dangerous precedent: If individuals and entities are unable to discuss settlement confidentiality, without fear that their settlement communications will later become the foundation of an arbitral award, then there will be far fewer settlement efforts and many more disputes that will require resolution by courts and arbitrators.

100.    Federal Rule of Evidence 408 did not blink into existence in a vacuum. It represents the end-product of hundreds of years of practical judicial experience confirming that settlement communications are often "irrelevant, since the offer may be motivated by a desire for peace rather than from any concession of weakness of position"; and, even if they are arguably relevant, "public policy" demands that they be excluded from consideration as evidence "to encourage settlements which would be discouraged if such evidence were admissible." Fed. R. Evid. 408 (Advisory Cmte. Notes).

101.    In this instance, the Court must look to the Interim Award to have a complete understanding of the rationale and improper analysis carried out by the arbitral panel in its issuance of the Final Award. A true and accurate copy of the panel's Interim Award issued on June 17, 2019 is exhibited hereto as Exhibit 1.

102.    Though it may be true, as the arbitral panel observed in its interim award, that the Federal Rules of Evidence are not strictly applicable in the context of arbitration, it is simply not true that "the disclosure of settlement negotiations" is "rarely, if ever, . . . prejudicial." (See Exhibit 1 p. 5 n.1.)

103.    To the contrary of the panel's misguided analysis, case law holds that introducing offers of settlement not only can result in a mistrial, but it is so prejudicial that it may even require the "extraordinary" and "rarely[-]invoked" remedy of assigning the retrial to be conducted by a different judge.

104.    Indeed, the arbitral panel's determination to base its interim award on settlement communications was based on three cases, one of which, Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 31 (1991), does not appear to address the consequences of considering settlement communications at all, and the other two of which are distinguishable to the point that they inadvertently support Tradiverse's position that the disclosure of the settlement communications was improper and prejudicial.

105.    For example, the arbitral panel cited Ouziel v. Shearson Lehman Bros., Inc., 1998 U.S. Dist. LEXIS 3037, at *5 (E.D.N.Y. Apr. 11, 1988), where (a) the party that objected to the disclosure of settlement communications had prior notice that the disclosure was going to be made and did not object in time, (b) the arbitral panel had rejected the evidence once it was disclosed, and (c) the reviewing court specifically found that there had been no prejudice by the disclosure.

106.    The arbitral panel also cited Nat'l Bulk Carriers v. Princess Mgmt. Co., 1978 U.S. Dist. LEXIS 14758, at *19 n.8 (S.D.N.Y. Oct. 24, 1978). But, as the Second Circuit noted in the appeal of that case, the settlement communications were "introduced at the arbitration without objection"; the settlement communication was arguably irrelevant; the arbitrator "testified that he regarded the" settlement communication "as irrelevant"; and the settlement communication was only discussed "well after [the arbitrator] had announced that he considered liability established," meaning that there "is simply not any evidence of prejudice . . . that would justify vacating the award." Nat'l Bulk Carriers, Inc. v. Princess Mgmt. Co., 597 F.2d 819, 825 (2d Cir. 1979); accord

20

id. at 823 n.8 ("To the extent the settlement offer was relevant at all, it was relevant only on the issue of liability.").

107. In this case, by contrast, Tradiverse was not provided any notice that the settlement communications would be disclosed and lodged an objection as soon as the disclosure was made; and the arbitral panel not only accepted the evidence, but expressly cited it as the basis for its interim award, confirming that the settlement communications were relevant, and rendering the error inherently prejudicial to Tradiverse.[7]

108. To be sure, arbitration is an alternative to litigation where the Federal Rules of Evidence and Civil Procedure do not always strictly apply. But that does not mean that arbitrations are completely haphazard affairs, in which the commercial expectations honed over centuries of traditional judicial practice are subject to be overturned on a whim. Or, to put it simply, parties to an arbitration must be afforded a fundamentally fair hearing. See 9 U.S.C. § 10(a)(3) (requiring vacatur of an arbitration award if "the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy[,] or of any other misbehavior by which the rights of the party have been prejudiced.").

109. As the Second Circuit has stated, this provision "essentially sanctions the application of the forum state's standards of due process." The inquiry is "limited to determining whether the procedure used was fundamentally unfair," and ensuring that there was "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"

110. In this case, Tradiverse was deprived of a fundamentally fair hearing by absorbing the one-two punch of (a) Luzar's failure to provide any notice or an opportunity to object to its

---

[7] Though the arbitral panel suggested, in passing, that the settlement communications may have been "irrelevant to this motion," Interim Award at 5 n.1, that statement is impossible to square with the fact that the content of the settlement communications comprise almost the entirety of the "Statement of Undisputed Material Facts" resulting in the interim award.

introduction of confidential settlement communications; and (b) the arbitral panel's refusal to consider or address the merits of Tradiverse's request for sanctions to ameliorate the due-process violation by excluding the settlement communications from its consideration.

111.    Courts and commentators have "highlight[ed] dangers in the let-it-all-in approach," and counsel in favor of excluding "marginally relevant evidence where the relevancy is clearly outweighed by undue prejudice," at least not before "articulat[ing]" its value, and considering the effect that its disclosure may have in improperly skewing the deliberative process.

112.    "Arbitrators may consider reminding the parties of the importance of not unnecessarily exposing the Arbitrator to likely inadmissible evidence (e.g., prior settlement offer) that may be unfairly prejudicial."

113.    It is axiomatic that the arbitral panel's Final Award, while steering away from the at length discussion of the Settlement Communications that was contained in the Interim Award, stood on the shoulders of their prior decision and clearly, the same misguided analysis prevailed.

114.    Both the interim and final arbitral Awards in this case dismissed all of those interests and expectations by relying on a set of inapposite cases and dismissively remarking—in a footnote—that "the disclosure of settlement negotiations has rarely, if ever, been found to be prejudicial." But that is simply not true: Disclosing settlement negotiations is often prejudicial, as scientific data confirms that the exposure to inadmissible evidence has a tendency to taint the decision-making process.  This demonstratively shows the prejudicial effect, which ultimately came to prevail in the issuance of the arbitral panel's Final Award.  The bell- could not be un-rung.

115.    It was inappropriate for Luzar to disclose confidential settlement communications without providing Tradiverse notice or an opportunity to object. And it was inappropriate for the arbitral panel to dismiss, without any substantive analysis, the possibility of disregarding the

settlement communications in reaching its interim decision. As a result of this combination of errors, Tradiverse was deprived a fundamentally fair hearing.

116.   It is clear that the arbitral panel exceeded its authority in rendering its Final Award which relied, in part, on the improperly considered, privileged confidential settlement communications.

117.   Furthermore, it is alleged upon information and belief, the arbitral panel's decision to allow for the improper inclusion of privileged and confidential settlement communications was as a result of the improper benefits conferred by Petition to ADM, the then employer of NAEGA panelist Michael Kaye.

118.   NAEGA, for its part, continuously influenced the proceeding by virtue of the selection of the panel members, its improper communications with Petitioner, its refusal to disclose communications under the guise of a joint defense agreement with Petitioner, and its conferring of benefits upon the Tradiverse selected Arbitrators by ways of an undisclosed lavish trip to Tokyo.

119.   For the reasons set forth above and as detailed with the supporting Memorandum of Law, the Final Award dated December 20, 2019 is subject to vacatur under 9 U.S. Code §§10 (a)(1),(2),(3) and (4).

**WHEREFORE**, Tradiverse respectfully requests this Court enter an Order vacating or otherwise modify the December 20, 2019 Award; or in the alternative, should this Court deem it proper, Respondent's request the opportunity to engage in limited discovery to further evidence the underlying corruption which permitted and allowed for the evident partiality, misconduct and exceeding of authority as detailed herein; and any further relief that this Court deems just and proper.

DATED:      New York, New York
            March 13, 2020

                        Yours, etc.

                        **THE LAW OFFICES OF NEAL BRICKMAN P.C.**

                        By: _____
                        Jason A. Stewart, Esq.
                        *Attorneys for Respondent*
                        **TRADIVERSE CORPORATION**
                        420 Lexington Ave., Ste. 2440
                        New York, New York 10170
                        (212) 986-6840

TO:

**FREEHILL HOGAN & MAHAR, LLP**
*Attorneys for Petitioner, Luzar Trading S.A.*
80 Pine St., 25th Fl.
New York, NY 10005
(212)-425-1900